The issue being whether or not Mr. Cunag had a reasonable expectation of privacy in this motel room. The court now has the benefit of the Batista case that came down on Friday, which deals rather directly with this same issue. And in Batista, as the court I assume is aware, the question was, the situation was the guy rented the hotel room with a stolen credit card. He remained in the room and the hotel took no affirmative steps to evict prior to the entry. And the Ninth Circuit said that the analysis in Dore applies. Cunag takes the same position. He got a key to the hotel room. He stayed there for two nights. The hotel never took any affirmative steps to evict him prior to the warrantless entry. And so I would contend that the analysis in Dore likewise applies. And the same result should obtain as occurred in Batista. Namely, he had a reasonable expectation of privacy at the point of entry. Now, it seems that that rule still makes sense. I want to go back to that. But in this case, even if let's assume that you can get over the first hurdle, how do you get over the burning smell coming out of an apartment? I mean, what manager worth his salt or her salt would allow an apartment place to burn down and endanger all the people when they open the door and they smell burning papers? Well, there's two answers to that. That seems pretty exigent to me. Well, the first answer is that is addressing the merits. Judge King never got to the merits. Judge King ruled that their ab initio, there was no reasonable expectation of privacy, and therefore, we do not have to address the merits of exigent circumstances and so forth. Can we assume that? No, I don't think so, because I am. We never got off. We never got our day in court, as it were, on the merits. We were thrown out on the reasonable expectation standing, as it were. Judge King specifically reserved the merits. So if we win here, the relief I'm asking for is return us to the court and let us then address the Fourth Amendment merits. Judge King never got there. But the second answer to your specific question is there was no smell of smoke until the door was opened. Don't we have quite a different situation here in that the hotel manager had checked out and knew that this was an invalid credit card or suspected it was an invalid credit card. They couldn't find the owner of it, who was dead. And he had offered an invalid driver's license as proof. You don't have that in the Bautista case. You have a worse situation in Bautista. It was apparently clear from the credit card company that www.hotels, they called up and told him this is a stolen credit card. Well, but the case, we must now determine whether a registered occupant of a motel room retains a legitimate expectation of privacy in the face of an unconfirmed report that a stolen credit card number was used to reserve the room. We don't have an unconfirmed report. It seems we have a confirmed report that the whole, the entire affair was fraud. Let me point out several references why that's not the case. First of all, when the police arrived and the hotel manager, Lamas, asked for some assistance, he told the police he wanted to go to the room to speak to the occupants about payment. That sounds like negotiation of terms. That's on ER 107. Secondly, when he got to the room and knocked on the door, what did he say? First of all, Lamas, not the police, knocked on the door. And when Lamas knocked on the door, he told Koenig he wanted to talk about the bill. That is not an affirmative act of get out of here, you fraudulent guy. That's, I'd like to talk about payment. And it's pretty clear to me from this record that if Koenig had cash or an alternative form of payment, he could have remained in the room. So the crucial question. Assuming they had a way to get into the room consistent with the Fourth Amendment, he'd have problems, obviously. But they didn't know that at the point of the entry. The point, the question is, did they have a right to enter in the first instance? And since Doré, excuse me, well, both Doré and this case on Friday, Batista, say that there's two, the way I read the case is there's a condition subsequent to a reasonable expectation of privacy. And that condition subsequent has two parts. The first part is that they have to, the hotel has to determine somehow that the guy shouldn't be in there in the first place. He's wrongfully in there. That's the first part of the condition subsequent. The second part is that it's got to be communicated and there's got to be some affirmative act of dominion inconsistent with the continued possession of the room by the occupant. And it's that second, the first part in my mind is questionable. And it's questionable because they were continuing to talk about payment terms. And it wasn't an eviction situation. The second part is completely missing because the record is clear that there was no affirmative act of dominion inconsistent with Kunan's continued occupancy of the hotel room. So without the condition subsequent, the legitimate expectation of privacy remains. That's the analysis that you have to apply under Batista. What does legitimate expectation of privacy mean? Well, there's two parts. How could he have had a legitimate expectation of privacy given the manner in which he entered and occupied that room? Because he thought he could use this card. He'd used it before successfully. It was a valid card. He got it from the brother of the card holder. But he also admitted he forged his identification because he didn't think any, and he actually forged a note, too, because he didn't think anyone would believe that. And the court found that incredible, as it were. Didn't find the defendant to be credible. The judge, Judge King, in my opinion, conflated the two questions of reasonable and subjective expectation by saying, you knew you were in there by fraud, so you couldn't have an objective, subjective expectation. I did say that. And that's wrong. It's conflating two separate questions because in the Batista case, the guy apparently knew that he gave a stolen credit card. We can assume that Batista knew that. So the same analysis would apply. How could he have any kind of subjective expectation if he knew full well that he gave a stolen credit card to get in there in the first place? Does a burglar have any expectation of privacy? No, that gets into the off-season burglar question under Ruckus v. Illinois. What is the difference between this person and a burglar? Well. He used a different method, but he obtained the occupancy of the room illegitimately. Well, that was, the court made a finding of that, and there's no question that there were, he had the invalid backup documentation, but at the same time, he had a valid card that was in effect. Well, the card is valid after the owner of the card is dead. Didn't he know she was dead? This wasn't the brother's card. It was his sister's, and she's dead. That's right. What makes that card valid? The card was, as I argued in the reply brief, the question is, were they going to get paid? In his mind, according to his testimony. You're saying the card's valid because they've used it before and it worked. The account was in effect. The account had not been canceled. The credit card account promises under any circumstances to continue to honor a card when the authorized person on the account is dead. Well, he was obviously wrong in his legal analysis as a layman here. Mistake of law. Well, I'm not arguing that it was a valid use of this credit card. I don't think that that's dispositive for the Fourth Amendment question. Obviously, Batista would have lost if that was the analysis. Well, but I go back to Batista, and they talk about it as an unconfirmed report that a card was used to reserve the room. Here you've got confirmed stuff all over the place, including that the DMV identification is fraudulent and counterfeit. Well, let me give you an example that may, as I was thinking about that, may explain why it's irrelevant to the Fourth Amendment. Well, let's assume when I purchased my home, I used loan fraud to get the loan. If I hadn't have had a false statement on the loan application, I would have never gotten into my home. And I knew full well when I purchased that home that I was in there by a false statement on the mortgage application. So, therefore, I take possession of the home. Then the police come one day and barge into the home without a warrant, and I want to challenge that. And they say, you used fraud to get into that home. You knew full well you had no right to be there. And let's say somehow they can prove that I was violated 1014 to get in there. I would argue that I still have a Fourth Amendment privacy interest, and I don't think that that situation is distinguishable. Well, it is, because at that point you do find the difference between somebody's home and a motel room. I don't think so. And the characteristic of a motel room is quite different than the characteristic of a home. Well, the case... The Constitution itself. Does the Constitution say motel room? It says it's a residence is a residence is a residence under the Fourth Amendment. Now, the cases make that quite clear. Well, it took us... It was a stretch for the Constitution to even recognize motel rooms at first as similar to houses for the purposes of expectations of privacy. But that's the difference here. I mean, I don't see much difference between your client, with all respect, and a burglar. Well, I went into great length in the reply brief to give seven distinctions on the facts.  He went to the front desk, gave him a credit card, got a key. There's a difference between larceny and theft by false pretenses. It's all theft. But it's a lot different than the burglar. You would have a stronger argument, Your Honor, if he had crept in the window. Then there would be no... And if he somehow hid his presence. But he stayed there for two days. He went through the process. Admittedly, he had the backup, false backup documentation. That's the problem I have, and I can't get around that, and that's part of the facts. But that doesn't control the Fourth Amendment analysis. And I would suggest to you that there is no... Under the law, there is no particular difference between a hotel room and a private home. Is society prepared to accept this expectation of privacy as reasonable? Apparently, the Batista panel says yes to that precise question on Friday. And the reason is there's a way to deal with this problem. And the way... Obviously, you can't have a situation where people fraudulently enter hotel rooms, and they can do that with impunity, and you can never get them out. The law has an answer to this. And the answer is this condition subsequent, two parts. First of all, you've got to make a just determination somehow that the guy ain't got a right to be there. But secondly, to have an orderly way to deal with this, we don't just have people barging in. There's got to be an exercise of dominion, a private act. This would be more than calling the police and having the police accompany you to the room. I mean, that seems like you want to... He didn't say, I want you to evict this person. But he did call the police and said, come with me to the room, right? Yeah, I think what happened there is if the police, if he couldn't have... Once Kunag opens the door, let's assume the smoke wasn't there. Once Kunag opens the door, Llamas was obviously going to ask him about this and cross-examine him about the problem here. And if Kunag couldn't make alternative payment arrangements, then he would call the officer who was standing to his right out of sight, come in and help me evict these guys. But that's the critical point. They hadn't exercised the private act of dominion inconsistent with Kunag's continued occupancy of the room. And until that point, he has a right under the Fourth Amendment, a legitimate expectation of privacy. But that's how, that's the tipping point, is that condition subsequent. Does it make a difference that in our case, the hotel manager knocked on the door and asked him to open, whereas in the Bautista case, the police knocked on the door and demanded that they open? I think that that factor cuts in favor of Kunag. If the police had knocked on the door, say, police, open up, that sounds a lot more like eviction. That sounds like an exercise of a private act of dominion inconsistent with continued occupancy. And I think that that is a rather significant fact that the, number one, the identity of the person knocking on the door on Kunag's door was the hotel manager rather than the police. And number two, what he stated when he knocked on the door, Kunag, I'd like to discuss payment of the bill. That's likewise inconsistent with, completely consistent with his continued occupancy. So I think both of those factors that the court indicated cuts in favor of Kunag. So in my opinion, the Bautista case on Friday is not materially distinguishable and points to the direction this court should go. Thank you. Thank you, counsel. May it please the Court, Peggy Meier for the United States. The case before the Court today is distinct from Bautista in three significant ways. First, at the very threshold level, Bautista seemed to frame the issue, as Judge Trott pointed out at page 370, 3785, as we must now determine whether a registered occupant of a motel room retains a legitimate expectation of privacy based on the unconfirmed report that the credit card was stolen. The focus is on the word registered occupant. There, Bautista registered in the hotel in his own true name. Here, we don't have registration in any meaningful fashion. We have a person approaching the hotel, giving a false name, a false address, a false phone number, a false company name, and a fraudulent credit card. No meaningful registration. So at a threshold level, Defendant Kunag never obtained the right to privacy that the Bautista court found Mr. Bautista had in their case. Do you think that in Bautista that they called it unconfirmed? Do you think that it was really unconfirmed? It sounded like they had some pretty good evidence that it was a stolen card. I do agree that there was evidence, there was confirmation, or at least a report from the website that they had confirmed from the cardholder that the charges were disputed and it was alleged to have been stolen. The Bautista court seemed to focus primarily on the actions taken by the hotel, though, to investigate. It mentioned that this was a rather inexperienced hotel manager who had no experience with this, and based on that inexperience decided to defer to the hotel's policy regarding guests who overstayed their expiration term and said, you know, if we can go negotiate a term of payment, then I will allow this person to stay. That is specifically stated in the Bautista record. Here there is no such record. We have a savvy... I think Mr. Harris, though, seems to raise the point that, I mean, the manager doesn't say, I want, you know, get this guy out of here. The manager seems to want to go talk about the payment. The manager does determine that fraud has been committed and he believes the hotel will not be paid. He does make the statement that he wants to go speak to the occupants about payment. However, that's equally consistent with being paid for the night or two that has already been spent rather than allowing him to stay for the full term that he's already registered for. He does ask the police to accompany him to the room, which indicates a more confrontational rather than negotiation mode of speaking to the person in the room. But it is clear he took many steps to confirm the fraud that the manager in Bautista did not. Do you think that it's significant whether the manager says, I want to evict the person or I just want to get my money or I want to see if they can pay for the rest of it or is that even necessary for us to reach? Your Honor, I believe because the threshold issue before this Court is different, i.e. whether there was ever a conferring of a Fourth Amendment right in the first instance, I don't believe that this Court has to reach that issue. I think the issue of investigation and a decision to terminate the occupancy comes into play once this Court decides that someone has registered and has obtained a right to privacy. At that point, the Bautista Court does seem to suggest that efforts along the lines of evicting someone are probative, although not necessarily conclusive. I don't think the Bautista Court has held that you must actually evict. I believe the wording was taking affirmative steps to terminate the contract. And I think in this instance where the manager does confirm that the DMV is fraud, the driver's license provided was fraudulent through the DMV, confirms through the Bank of America that the MasterCard is not going to be honored because they could not obtain permission from the cardholder who was dead. The fact that the address on file at Bank of America does not match the address provided to the hotel. The manager doesn't know the person was dead though, right? They just can't, obviously the person didn't answer the phone because they're dead. Correct. That was something the police determined later. However, it was something that Mr. Kunag knew at the time and he admitted that he was using this dead woman's credit card and that he did forge these notes purporting to be from the dead woman because he felt that was necessary in order to use the card. Point one is that Mr. Kunag was not a registered owner. What name did Mr. Kunag register in? Nelson Abon. Who's Nelson Abon? Nelson Abon was his co-defendant and at the hearing he explained that he did that because Nelson Abon was the only person with an ID at the time. However, he did not have his co-defendant register at the hotel. Mr. Kunag's testimony was that he was the person who went in, filled out the paperwork and signed on behalf of Mr. Abon. This is one of the reasons why I tend to see him more as a burglar than an occupant in the Bautista case. Okay, what's point two? He's not a registered owner is point one. Point two? Point two is the fact that in the Bautista case there was much discussion of the fact that the credit card was used to reserve the room. There was not yet a determination that the credit card was going to be used to pay for the room and that the question of payment had been unsettled. Here we have ample proof, undisputed proof, that Mr. Kunag intended to pay for the room with his credit card. He took great lengths or went to great lengths to make sure he was able to do that. When he first presented the credit card, the hotel said, you can't use this unless you have the cardholder's authorization. So he left, created authorization note number one, forged it on behalf of the dead credit card holder and brought it back. He was then told, well, you need a second form in order to use this credit card. He went, created a second forged note on behalf of the dead credit card holder. That's at ER 155. It's the actual note that says the charges on this room should be placed on this card and I, Principicia Appan, will honor them. At that time he also gave the fabricated, manufactured driver's license, which he admitted he manufactured. He inserted the man's picture, although Principicia Appan was a woman. He put a false address and he gave that to corroborate his fraud, that this woman was alive and authorizing him to use the card. So every time I check out of a motel room or a hotel room they say, do you want to keep it on the same card? And that's your point, the actual method of payment hasn't been decided until that moment. But here it's different on these facts. Indeed, and I think especially in the fact in Bautista they used an Internet reservation. I think it's become a common occurrence that someone making a reservation through the Internet uses whatever is most immediately available and that's not necessarily how they pay for the room or the item once the payment is requested. Point three. Point three is, as the Court has mentioned, the investigative techniques used by this hotel manager differ drastically from Bautista. Here we have someone who had experience with credit card fraud. He said in his experience what happens when the card company discovers the fraud is that the hotel company is charged back and that they receive a loss because of the fraudulent activity. And because of that he investigated. He called the DMV. He confirmed the license was fake. He called the Bank of America, confirmed that the information in their files did not match the information for the cardholder with the Bank of America, and that they had frozen the account because they could not confirm the authorization from the cardholder. On that he made the conclusion this is fraud. He called the police. He reported the fraud. And they came to assist him in discussing it with the tenants. Now, it is true the statement is that he went up to discuss payment in addition to going up and talking to them about the fraud that had been conducted. But, again, that is equally consistent with wanting to be paid for the nights already spent rather than allowing them to stay in the future. And, incidentally, the record does reflect at the time of the hearing Mr. Kunag admitted the reason he had this card in the first place is because he didn't have any money. So it is not the case that Mr. Kunag could have pulled out a couple thousand dollars to pay for his 30-day stay that he had registered for. It's simply a case where he was there on a stolen credit card, and that was the only way he could pay for the room. Does 30 days make a difference as opposed to, say, if it had been one or two? I mean, that's fairly long. I think, Your Honor, had he been a true registered occupant of the room, it might. But I think it would encourage criminals to be more devious if in fraudulently renting a hotel room they just extended their stay so as to create or fabricate a right of privacy. Frankly, it's arbitrary because he had no intention of paying for the room. So he could easily have stayed an entire year just to give himself more protection that he hadn't truly earned by registering as a true guest at the hotel. What about Mr. Harris's point in terms of if you jump over the first issue or if you lose on the first issue, what about the smell of smoke coming out of the room? Your Honor, I believe we have to concede the Court did not reach a finding on the exigent circumstances, and if that was dispositive of this Court, it would need to be remanded for factual findings on that issue. The District Court below did stop at the threshold question, finding that Mr. Kunak had no reasonable expectation of privacy in a hotel room rented by fraud in this manner. So the record wasn't fairly presented on that issue? No. In fact, the declarations were before the Court, which set forth the facts. However, the defendant was not given an opportunity to cross-examine those witnesses nor to really argue that point given the Court's shaping of the factual issues he was willing to consider at the threshold level. Thank you. And with that, the Government would submit. Thank you, Counsel. Just a few brief points in response to the three points raised. With regard to the name under which he registered, I don't think the law should be that if you register under a false name at a hotel, you thereby lose your Fourth Amendment privacy interest. That could have a lot of implications. Oh, that's in and of itself. You might be right, but that's not the sole fact in this case. Right. Well, I don't think that that should be a controlling factor because that has implications that you don't want to have. Secondly, with regard to payment, in my mind, one of the important points is that it was undisputed in this record that this card had been used by Kunak to get hotels and I think some food over the previous three weeks under this arrangement he had with the brother. And apparently there's no indication that payment was not made. The card was still valid on November 14. Kunak had been using the card since the latter part of October, mid-October. So there's a strong indication it didn't the record doesn't really say point blank, but the fact that the card was still operative and the account hadn't been yanked by November 14 indicates that there was payment or something like it made by Kunak in the preceding uses of the card. Who was paying? I believe there was a motel and a restaurant that the – I can get you the site. And those bills were paid? There's no indication that it was not paid. Yeah, but, I mean, who paid them? The dead person didn't pay them. No, it would have been Kunak. Kunak's – Did Kunak say I paid those bills? I had now taken this account over and was paying for everything? Kunak's testimony was that that was the deal with the brother. Brother says, Kunak, pal, you can use this card, but the deal is you pay the bill. I don't want to get stuck with the bill. Kunak says, okay. He uses the card between October and November. And society is prepared to recognize as legitimate this kind of a crazy deal? Well, the question is, once the front desk gives him the key, he goes in, stays two nights there. He doesn't sneak into the room. He stays two nights there. And there's an ambiguous determination in this case whether or not the guy should be out or not. They go to the room. They don't evict him, but they say, let's talk about payment. And they don't take the affirmative steps to evict. That's the answer to your question then is yes. And the key point from Batista, and they hit it right on the head. I'm looking at page 3791 of the slip opinion. They say the critical determination is whether or not management had justifiably terminated Batista's control of the room through private acts of dominion. This gets to the two-part condition subsequent that I read this case. And so until you have that condition subsequent, the answer is yes, you do retain a legitimate expectation of privacy in this situation. Dominion. Does Cotton help you? Well, Cotton, as pointed out by Ms. Ryan, was apparently mentioned in the U.S. Supreme Court. Several lower courts inexplicably have held that a person present in a stolen automobile at the time of the search may object to the lawfulness of the search. The exclusionary rule would, of course, not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched. And if you go back to that, I mean, it suggests that Cotton not only is wrong but ridiculous, inexplicable. And the cases that you cite, Henderson and Doré, those seem to be distinguishable also because in those cases there was some kind of legitimate presence in the first place. And here, as pointed out by the government, doesn't seem to be any legitimate presence at all. I would submit it's stronger than Batista. Batista, the guy flat out stole the card. And you know that he did because the co-defendant, Ray or whatever his name was, it's right in a footnote in Batista, used the stolen card to take the room. And Ray was a crook. And so he gives it to Batista, his buddy, to run a counterfeiting operation down the hall. So you know full well that it was a phony card in Batista. Here, it's not nearly as clear because Koenig, his buddy, gives him the card. They're buddies. And he says, look it, Koenig, you can have the card. I inherited it from my sister. As lawyers, we know it doesn't work that way. But as a layman, Koenig here says, okay, fine. And he uses the card for three weeks. From all indications, paid for it or kept the card valid. There's no indication he stiffed anybody on this. And there's zero indication he intended to stiff this motel. Just the opposite. That's why I cited the Mays case. That was a fly-by-night guy going across the country. There's no indication he intended to stiff this motel? Right. You mean you can't strongly infer that from all the counterfeit identification and the confirmation that it was this card? That's to get his foot in the door. I believe that he was going to pay because he went to great lengths. What was he going to pay with? I thought he didn't have any money. He didn't have any money there, but apparently he had. What was he doing in the room? The charge was stolen mail. Sounds like it was a stolen mail operation. Pay for the room. Right. But the question is, was the hotel going to get paid or not? I don't know what he said there. I don't know what. Do you honestly think anybody with an IQ over room temperature could infer that he was going to pay for this room? Well, he'd pay. Apparently he'd paid up to up to then. How do you know he paid up to then? Because the card was still valid. The card hadn't been used. And then you have quite a while to pay the bill. You're talking about less than a month. The month, I don't know, my credit card says that at the end of the month. That's the only evidence that he had charged successfully up until then. And that plus the other fact that the card account was still not shut down. Do you have anything else? No. An interesting case made more interesting by subsequent developments in the Ninth Circuit. Thank you both. Thank you. We'll grapple with it and get you an opinion as soon as we can. The case just argued is ordered submitted. And that exhausts today's calendar. We'll be in recess until tomorrow morning at 9 o'clock. All rise. This court for this session stands adjourned. Thank you. Thank you.
judges: Hall, Trott, Callahan